**Joseph MASCETTA, Plaintiff,**

v.

**Joseph MIRANDA, Individually and as Assistant Warden of the Westchester County Department of Correction, Richard S. Adamovic, Individually and as Assistant Warden of the Westchester County Department of Correction, Carl Fehrmann, Individually and as Sergeant in the Westchester County Department of Correction, Charles Bonanno, Individ-**

ually and as Sergeant in the Westchester County Department of Correction, Joseph Stancari, Individually and as Chief of Operations of the Westchester County Department of Correction, Norwood E. Jackson, Individually and as Commissioner of the Westchester County Department of Correction, and the County of Westchester, Defendants.

No. 95 Civ. 789(WCC).

United States District Court,
S.D. New York.

March 5, 1997.

Lovett & Gould, White Plains, NY (Craig T. Dickinson, of counsel), for Plaintiff.

Marilyn J. Slaatten, Westchester County Attorney, White Plains, NY (Lori A. Alesio, Asst. County Attorney, of counsel), for Defendants.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge:

Plaintiff Joseph Mascetta ("Mascetta"), a Sergeant in the Westchester County Department of Correction, has brought an action under 42 U.S.C. § 1983 and the New York Civil Rights Laws against Westchester County and six of its Corrections Department employees, ("defendants"), individually as well as in their official capacities, alleging ten claims for violations of his rights under the First, Fourth and Fourteenth Amendments of the United States Constitution, as well as under various provisions of the New York State Constitution. Defendants have moved for summary judgment on all claims under FED.R.CIV.P. 56. We have jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

### BACKGROUND [1]

Initially, Mascetta alleges defendants retaliated against him to punish him for voicing his opinion on two separate issues. He claims that in response to his statements, defendants conspired to frame him and fabricate false disciplinary charges against him in order to coerce him into resigning, and that

---

1. The facts of this case are hotly contested. We have tried to present as coherent a picture as possible of the basis for Mr. Mascetta's allegations. In order to do so, we have had to rely upon the testimony of witnesses as to events that are disputed. This summary is not to be taken as an endorsement for any particular version of the facts, but as merely a tool to provide background to this motion.

in the course of the conspiracy, they violated a number of his constitutional rights. We discuss the alleged statements first, then the alleged retaliatory actions by the defendants.

The first statement for which Mascetta claims defendants retaliated against him involved his criticism of a fellow employee for violating security procedures around January of 1992. Mascetta stated that he believed that a brutal attack on two Corrections Officers had resulted from the increased smuggling of contraband into the jail. Masc. Depo. 95–96. He alleges he saw Officer Kennie performing grossly inadequate strip searches in the visitor area and that, with the help of Captains Page and Forti, he prepared a report on his observations and gave copies to Assistant Warden Miranda and Chief Joseph Stancari (defendants in this action). Mascetta states that when Kennie remained on his post, he confronted Miranda and said "What is up with this? You know I wrote this guy up" and Miranda said "Why don't you mind your own fucking business." Mascetta retorted "Why don't you do your job?" and Miranda told him to counsel the officer. *Id.* Miranda claims that he does not recall the conversation, Mir. Depo. p. 19, and the report cannot be found. (Mascetta claims it was taken by defendants from his locker.) There is no testimony from Page and Forti in the record.

The second statement for which Mascetta alleges defendants retaliated against him involved his criticism of Miranda for "pressuring" him into buying a defective automobile from Miranda's wife in early 1992. As Mascetta describes it, he had been late to work several times because his car died, and Miranda warned him he could not keep coming to work late. Masc. Depo. p. 118. Mascetta states that Miranda gave him one of his wife's business cards, and told him to visit the dealership "she managed." *Id.* at 124. When Mascetta visited the dealership, Miranda himself was there. Mascetta looked at some cars but decided the prices were too high. He claims that Miranda later called him and told him there was a car he could afford and "we will guarantee it." *Id.* at 119. Mascetta then bought the car.

Shortly thereafter Mascetta allegedly learned that probationary Correction Officer Curley had been similarly pressured by Miranda, and had refused to buy a car from Miranda's wife because they were too expensive. According to Mascetta, Miranda then "assigned Curley to areas of the jail beyond his skills and ultimately had him terminated". *Id.* at 126–127. Mascetta says Curley told him he had been coerced by Miranda and that Miranda was giving him bad work assignments. *Id.* When Curley was terminated, Mascetta "felt" that it was because of his failure to buy a car. *Id.* Mascetta states that shortly thereafter he began to have problems with his car. He requested that the dealership fix it, and when he became dissatisfied with the dealership's response to the car's problems, he confronted Miranda, telling him "You fucked me." He alleges that Miranda responded "You are going to be sorry for that." *Id.* at 95. Defendants deny that this incident happened, pointing out that plaintiff has no personal knowledge as to the reason for Curley's termination, and has not offered Officer Curley's testimony. Def. Br. p. 10.

The allegedly false disciplinary charges preferred in retaliation for the above speech pertained to Mascetta's intercession into an April 2, 1992 dispute between inmates Thomas Holcomb and Matthew Parker. On that date, Mascetta responded to an alarm sounded by Officer Russell Duncan, the Corrections Officer on duty. When he arrived, according to Mascetta, he saw Holcomb severely beating Parker, and he ordered them to stop several times. Masc. Depo pp. 81–82. The inmates ignored him and he physically intervened to break up the fight. He and Holcomb exchanged blows until he was able to subdue Holcomb. *Id.* At some time during the altercation, Correction Officers DiFiore, Cerasi and Bonanno[2] arrived. Bon. Depo. p. 31.

There is a dispute as to what occurred thereafter, particularly with regard to whether, as Bonanno stated in his report on the incident and his deposition, Mascetta dragged Holcomb into the elevator by the hair and kicked him in the head. Bon Depo.

2. Bonanno is also a defendant in this action.

at pp. 26–27. Mascetta states that *Cerasi* and *DeFiore* placed Holcomb in the elevator and took him to the infirmary and that he did not approach the elevator with Holcomb. Masc. Depo p. 86–87. There are conflicting reports from the other officers who were there.[3]

According to Miranda, Sgt. Carl Fehrmann came to him personally raising concerns about Mascetta's treatment of Holcomb. Mir. Depo. p. 33–36. Fehrmann states in his April 22nd report that he and Sgt. Gilliam met the elevator when it arrived from the third floor where the incident occurred, and that he took Holcomb from the elevator to the infirmary. Pl. Exh. 14. Miranda testified that Fehrmann told him that when the elevator arrived at the infirmary, it appeared that Holcomb had been assaulted and was having a seizure. *Id.* at p. 44. He claims that Fehrmann also told him that he [Fehrmann] then called Mascetta for an explanation and Mascetta told him "The inmate punched me in the chest, so I let him have it." *Id.* at 44.

Miranda testified that as a result of Fehrmann's concerns, he called Bonanno who confirmed Fehrmann's story.[4] *Id.* at 33–36. Bonanno filled out a report for Miranda on that date, and testified that later that day Miranda requested he fill out a second report because his "didn't contain enough information." Bon. Depo. p. 9, 15. This report is dated April 14, though Bonanno testified he wrote it on April 2. *Id.* p. 16. Mir. Depo. p. 33–36. Mascetta alleges that Miranda, relying upon "false statements solicited from Fehrmann, Bonanno and Holcomb, initiated a process to bring false disciplinary charges against Plaintiff." Pl. 3(g) stmnt. ¶ 25.

Without asking either Officer Bonanno or Fehrmann for a written report, Miranda prepared a report for his supervisor, Chief Stancari. Stancari requested that Miranda conduct a preliminary investigation, during which Miranda interviewed the two inmates involved and some of the officers. *Id.* Mascetta alleges that during the investigation, Miranda approached Holcomb and urged him to file against Mascetta and others, including Duncan, the County of Westchester and the Westchester Department of Corrections, a "meritless" lawsuit, which was later settled for $10,000. Stlmnt. Stip., Pl. Exh. 17; Masc. Depo. pp. 174–175.[5]

In his investigation Miranda did not speak with everyone involved, but with only Holcomb, Bonanno and Fehrmann and two inmates who may have witnessed the event. Mir. Depo p. 46. He recommended that further investigation should be undertaken and/or formal disciplinary charges should be filed against Mascetta. *Id.* at 49. As further evidence of a conspiracy to bring false disciplinary charges against him, Mascetta points out that Miranda did not consider recommending that investigations or disciplinary proceedings be instituted against other officers involved. Pl. 3(g) stmnt. ¶ 25, citing Mir. Depo. pp. 43, 45–46, 49–51. Miranda gave the report to Stancari who passed it on to Commissioner Norwood E. Jackson. Stanc. Depo. pp. 26–27, 33–34. On April 20, 1992, Jackson requested the Special Investigations Unit ("SIU") investigate the matter in greater detail. SIU was given a copy of Miranda's preliminary investigation report, and Sergeant William Pudney and Assistant Warden Adamovic (also a defendant) were

---

3. Duncan, Cerasi and DiFiore also filled out reports. Dickinson Aff., Exh. 8–11. Duncan's report states that Holcomb punched Mascetta, Mascetta "restrained" Holcomb and that Mascetta "carried Holcomb out of the block." *Id.*, Exh. 9. Cerasi's April 21st report says that Holcomb was unconscious and began to revive and at "no time" did Mascetta enter the elevator. Pl.Exh. 10. DiFiore's report states that he and Cerasi "removed" Holcomb to the elevator. Pl.Exh. 11.

4. Mascetta claims that he had "past problems" with Fehrmann and Bonanno. As he describes it "they would ask Plaintiff to resolve problems because they were otherwise engaged. Plaintiff would later learn that they were not busy and

simply did not want to deal with the situation. Plaintiff criticized both Fehrmann and Bonanno for these 'dumping' incidents." Pl. 3(g) stmnt. ¶ 24.

5. Mascetta's basis for this belief is an alleged phone call he received from a corrections officer, telling Mascetta that Miranda had "told him [the officer] or Holcomb in Ward 29 that, You'll get some money out of Mascetta if you do what I tell you to do," Masc. Depo. p. 175, and that Fiffidio, Mascetta's attorney in the Holcomb suit, had told Mascetta the he heard the defendants had conspired against him. *Id.*

designated to conduct the investigation. Admv. Rept., Pl. Exh. 18.

SIU interviewed the officers who were present during the incident, as well as the inmates. Holcomb testified that Miranda grabbed him by the hair and pulled him to the ground and that he and others kicked Holcomb in the face and that Mascetta then pulled Holcomb onto the elevator and kicked him in the face until he passed out. Hlc. stmt., Pl. Exh 16. SIU received conflicting versions of the story, particularly with regard to whether Mascetta was in the elevator, however, and concluded in its April 29th report that DiFiore and Cerasi had falsely stated that Mascetta was not on the elevator. Admv. Rept. p. 7, Pl.Exh. 18.

At the conclusion of SIU's investigation, Commissioner Jackson recommended disciplinary charges be filed against Mascetta. On April 29, Jackson ordered Mascetta suspended without pay and, consistent with Correction's standard operating procedures, to surrender his badge, identification card and all weapons because his firearms carrying privileges, on or off duty, were likewise suspended. *See* Ltr. to Pl., Pl. Exh. 19. On May 29, Mascetta was served with a Notice of Charges alleging that he had used excessive force on Holcomb, Notice, Pl. Exh. 21, and was suspended with pay. *See* Ltr. to Pl., Pl. Exh 20. According to Mascetta, "Adamovic, Putney or both" called him up to tell him that his weapons would become department property, and as a result he was forced to sell them for far less than they were worth or to give them away. Masc. Depo pp. 11–15, 194–195.

Plaintiff's disciplinary hearing was held on July 2, 1992, and continued on August 4, August 17 and September 22. He was represented by an attorney and given an opportunity to present testimony and argument in his defense. Rosen Rpt., Pl. Exh. 24. Paul Rosen, the independent hearing officer appointed by Commissioner Jackson, stated, in part, that:

"[i]t appear [sic] that testimony or reports favorable to the Charged Party's position were not included in the reports filed and forwarded in the investigation of this matter . . . .

Additionally, almost all witness [sic] have a significant reason for questioning the validity of their testimony, and I find that, in part, most witnesses were not completely truthful when they testified. To further illustrate the problem: the alleged victim HOLCOMBE has a law suit pending against the County of Westchester which was contemplated immediately after the incident. The correction officers who testified or whose reports were admitted as evidence, might wish to alter their testimony in an effort either to protect or condemn a fellow officer, or get even for some prior problem is more likely. As to those who were actually present during the incident, they might have lied to cover up their own actions or misdeeds . . . .

Although, it is clear that HOLCOMBE was kicked in the face; it is also clear that more than one individual participated in the kicking . . . . Although it is clear that there appears to be an excessive use of force, I have insufficient testimony to allow me to determine that it was Sgt Mascetta that was guilty of that excessive force . . . .

Accordingly, I recommend to the appointing authority that the instant charges be dismissed as not proved by the evidence presented.

Rosen Rpt., Pl. Exh. 24. Bonanno later received a disciplinary letter and counseling for inconsistencies between his testimony at the hearing and his prior statements. Bon. Depo. p. 12–13, 84. Mascetta urges that these inconsistencies concern Bonanno's admission at the hearing that he did not see Mascetta kick Holcomb in the head, contrary to his report. Bon. Trans. Pl. Exh. 23; Pl. Br. p. 12.

After the charges were dismissed, plaintiff was directed to report to work in the female division and was compensated at least partially for the thirty days he was suspended without pay. His firearms privileges had not been reinstated as of the date of the filing of this motion. Def. 3(g) stmnt. ¶ 23. He claims that defendants broke into his locker and took some of his personal belongings. His basis for this accusation is that upon arriving at work, he found that his locker, "in a secure area of the jail which Defendant's

had access to," had been broken into and copies of the Holcomb incident reports he had retained had been stolen, as well has his boots. His personal effects had been searched and his uniforms damaged. Masc. Depo. pp. 105–106, 211–212, 216, 219. The combination lock was off. Only he and Captain Convery were authorized to have the combination. *Id.* at 216.

Mascetta alleges that defendants have committed other retaliatory acts as well. He asserts that their refusal to reinstate his firearms privileges has adversely affected his work assignments and stigmatized him at work. He states that defendants changed his shift time, causing him to work during a time of day when his "job-related" back injury flared up and interfering with his part-time employment. Lastly, he alleges that they attempted to solicit false complaints from female inmates in order to trump up meritless charges against him for sexually inappropriate conduct. Masc. Br. p. 14 (citations omitted).

Mascetta filed this suit in February of 1995 against Assistant Wardens Miranda and Adamovic, Sergeants Carl Fehrmann and Charles Bonanno, Chief of Operations Joseph Stancari, Commissioner Norwood Jackson (all Corrections employees), and the County of Westchester. All of the defendants except Jackson and Stancari testified against him at his disciplinary hearing. Pl. Exh. 24. The complaint alleges numerous violations of his rights under the Federal and New York Constitutions. We address the federal claims in order.

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(d). A material fact is genuinely disputed only if, based on that fact, a reasonable jury could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, all evidence must be viewed and all inferences must be drawn in the light most favorable to the nonmoving party. *City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 45 (2d Cir.1988).

The party seeking summary judgment bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Upon the movant's satisfying that burden, the onus then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "but must set forth specific facts showing that there is a genuine issue of fact for trial." *First Nat'l Bank of Az. v. Cities Serv. Co.*, 391 U.S. 253, 288, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). Summary judgment is usually inappropriate when the defendant's state of mind is at issue. *Clements v. Nassau Cnty.*, 835 F.2d 1000, 1005 (2d Cir.1987). In order to raise a fact issue regarding state of mind, however, there must solid circumstantial evidence to prove plaintiff's case. *Id.*

Without directly raising or briefing the issue, in setting forth the standard for summary judgment, defendants have cited one case that addresses the standard for qualified immunity for government officials acting in their individual capacities. Def. Br. p. 8, *citing Hurlman v. Rice*, 927 F.2d 74, 78 (2d Cir.1991); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) ("government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.") Despite defendants' woefully

inadequate treatment of this issue, we believe it to be of paramount importance to the disposition of their motion and have considered the issue *sua sponte*.

■■■ The Second Circuit has stated that when a defense of qualified immunity is raised in the context of a retaliatory claim, a court must decide first whether a clearly established right is at stake, and second, whether the conduct was objectively reasonable. *Blue v. Koren*, 72 F.3d 1075, 1084 (2d Cir.1995). Conduct that is objectively reasonable is not converted into a constitutional violation by the mere allegation of an unconstitutional motive. The Court elaborated that:

> [U]pon a motion for summary judgment asserting a qualified immunity defense in an action where an official's conduct is objectively reasonable but an unconstitutional subjective intent is alleged, the plaintiff must proffer particularized evidence of direct or circumstantial facts, supporting the claim of an improper motive in order to avoid summary judgment.... In our view, the particularized evidence of improper motive may include expressions by the officials involved regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken.

*Id.* (no allegations of particularized statements by state officials indicating a retaliatory motive).

■■■ The central basis of defendants' motion for summary judgment is that plaintiff has "failed to produce any evidence whatsoever" to support his claims and has thus not met his burden to avoid a summary judgment against him. This is simply incorrect. Mascetta has testified in his deposition to numerous specific facts, set forth above, that support his claim. Defendants discuss at great length the lack of corroborating evidence in the record. For example, Miranda denies that most of the conversations to which Mascetta testifies ever occurred; he does not remember an officer Curley; there has been no testimony by Curley in this case; and Mascetta did not report that items were stolen from his locker at the time of the alleged theft, etc. While these arguments constitute a strong challenge to Mascetta's credibility, in asking the Court to determine that Mascetta's testimony is incredible as a matter of law, defendants misapprehend the role of the Court. Determining the credibility of witnesses is the quintessential role of the jury, not the Court, *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14, and we reject defendants' contention that Mascetta's testimony constitutes "no evidence whatsoever."

■■■ Moreover, Mascetta's allegations, based upon his own testimony, include particularized circumstantial evidence of defendant Miranda's state of mind, that if true, are sufficient to overcome defendants' argument that the decision to investigate and proffer charges against Mascetta was objectively reasonable. (For example, Mascetta states that Miranda told him "You'll be sorry for that.") Thus, to the extent that defendants' papers can be construed to suggest that Mascetta's testimony constitutes insufficient evidence to meet the heightened evidentiary standard applied when a defendant has raised a qualified immunity defense, we reject that assertion as well.

Therefore, we proceed to consider defendants' rather bare assertions that Mascetta's allegations, even if assumed true, do not state a claim under the First, Fourth and Fourteenth Amendments of the United States Constitution.[6]

---

6. Although defendants apparently do not recognize it, (judging from the vagueness of their discussion and their complete failure to mention "qualified immunity"), these arguments fall under the first prong of the qualified immunity test—whether a clearly established right is at stake.

In addition, we note that although plaintiff has sued defendants in both their individual and official capacities, defendants' motion fails to address directly the official capacity aspect of the complaint. Though they make a fleeting reference to qualified immunity, this doctrine is not available to local governmental bodies or officials. *See Draper v. Coombs*, 792 F.2d 915, 919 n. 5 (9th Cir.1986). However, in order for a municipality to be held liable for the actions of its officers or employees, an official policy or custom of the municipality must be shown. *Monell v. New York Dep't of Social Serv.*, 436 U.S. 658, 686, 98 S.Ct. 2018, 2033, 56 L.Ed.2d 611 (1978). Plaintiff has alleged that only Miranda,

## II. *First Amendment Claim*

"It is well established that a public employer cannot discharge or retaliate against an employee for the exercise of his or her First Amendment free speech right." *Ezekwo v. NYC Health and Hospitals Corp.*, 940 F.2d 775, 780 (2d Cir.), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991), (citing *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972)). However, "It has also been recognized that the government has a legitimate interest in regulating the speech of its employees that differs significantly from its interests in regulating the speech of people in general." *Piesco v. City of New York, Dep't of Personnel,* 933 F.2d 1149, 1155 (2d Cir.), *cert. denied,* 502 U.S. 921, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991). In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court attempted to strike a balance between these competing interests in holding that "the scope of a public employee's First Amendment rights must be determined by balancing the public employee's rights as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Piesco,* 933 F.2d at 1155.

To make out a prima facie case, the employee must first establish that his speech can be "fairly characterized as a matter of public concern" and second "that the speech was at least a 'substantial' or 'motivating' factor in the discharge." *Frank v. Relin,* 1 F.3d 1317, 1328 (2d Cir.), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993) (citations omitted). The first element is a question of law, the second a question of fact. *Id.* If an employee does establish a prima facie case, a defendant can nonetheless avoid liability either by showing it "would have made the same decision in the absence of the protected conduct," or "if it can show that the employee's conduct interfered with its effective and efficient fulfillment of its responsibilities to the public." *Id.* at 1329 (citations omitted).

Mascetta alleges that the disciplinary charges brought against him were false and in retaliation for his criticism of jail security and Miranda's abuse of his supervisory authority by coercing employees to purchase cars from Miranda's wife's dealership. He alleges that both of these issues were matters of public concern, protected by the First Amendment, and that they were substantial motivating factors in defendants' actions against him. In addition to denying that the alleged speech ever occurred,[7] defendants make several arguments in support of their argument that it is not protected by the First Amendment. First, they state, without supporting argument, that Mascetta's speech was not a matter of public concern.

The Supreme Court has held that "[w]hen a public employee speaks not as a citizen

---

Adamovic, Bonanno and Stancari were policy makers, and that defendants Fehrmann and Bonanno "knowingly participated in the plan." Compl. 5–10.

While there are serious questions as to whether these officials are actually policy makers, *see Jett v. Dallas,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598 (1989) (relying upon state law "the trial judge must identify those officials or governmental bodies who speak with final policy making authority for the local governmental actor ... it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue by policies that affirmatively command that it occur or by acquiescing in a longstanding practice or custom ...."), *called into doubt on other grounds, Philippeaux v. N. Central Bronx Hosp.,* 871 F.Supp. 640, 653 (S.D.N.Y.) (reevaluating *Jett's* holdings regarding *§ 1981,* but reaffirming validity of above quotation), *aff'd,* 104 F.3d 353 (1996), and whether the conspiracy to retaliate against him alleged by Mascetta, effected by policy makers, is sufficient to support municipal liability, *see e.g. Simpkins v. Bellevue Hosp.,* 832 F.Supp. 69, 74 (S.D.N.Y.1993) (plaintiff need not allege more than single instance of misconduct to state § 1983 claim against municipality); *but see Philippeaux,* 871 F.Supp. at 653 ("the challenged action must have been taken pursuant to a policy adopted by the official ... ") (emphasis added), because the parties have not briefed these issues, we decline to reach them at this point.

7. As discussed above, we reject defendants' contention that Mascetta has offered no proof of that he made the speech at issue. He testifies that he did, and a reasonable jury might believe him, notwithstanding the lack of corroborating evidence.

upon matters of public concern, but instead as an employee upon matters of only personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). "Whether an employee's speech addresses a matter of public concern must be determined from the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. at 1690. "Other relevant considerations include whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Piesco,* 933 F.2d at 1156.

■ It is clear that Mascetta's alleged statements concerning lax prison security rise to the level of a public concern. Though the context of speech is relevant in determining whether or not it is a matter of public concern, First Amendment protection can apply when a public employee arranges to communicate privately with his employer. *Connick,* 461 U.S. at 146, 103 S.Ct. at 1689, citing *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 437, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). Security at the prison was a matter of concern to prisoners, prison workers, visitors and the general public who might fear that dangerous prisoners could escape. Whether Mascetta's alleged speech regarding Miranda's practice of coercing employees to buy cars was a matter of public concern or a matter of purely personal interest is a more difficult question, however.

We have doubts whether Mascetta's expression of dissatisfaction over Miranda's allegedly pressuring him to buy a car rises to the level of a public concern. Mascetta testified in his deposition he told Miranda: "Look

you told me not to worry about anything, you fucked me." Masc. Depo. 116. In the complaint he states that "in December of 1991 he expressed his opinion to Miranda and others in the Department that Miranda's practice of abusing his authority as Assistant Warden to coerce correction officers to purchase cars from the dealership which employed Miranda's wife was improper . . ." Compl. ¶ 12; Masc. Depo. p. 125. When asked what Miranda's response to this "expression of opinion" was, Mascetta testified Miranda said "You'll be sorry." *Id.* He also testified he talked to Officer Curley about Curley's being similarly pressured, and that Curley was soon fired. Even assuming that Mascetta's suspicion about the reason for Curley's termination is correct, this situation seems similar to that in *Connick.* There the Supreme Court found that the majority of the questions in a employee survey distributed by an employee of a District Attorney's office that sought other employees' views on the office transfer policy did not involve a matter of public concern.[8] *Connick,* 461 U.S. at 147–149, 103 S.Ct. at 1690–91. The Court noted that the constitution does not "require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the state" and that the survey did not inform the public that the District Attorney's office was not discharging its duties, but revealed "that a single employee is upset with the status quo." *Id.* It added that "while discipline and morale in the workplace are related to an agency's efficient performance of its duties, the focus of [plaintiff's] questions is not to evaluate the performance of the office, but to gather ammunition for another round of controversy with her superiors." *Id.* In this case, at most we have a grievance by two prison employees about the abuse of authority by an assistant prison warden. We question whether this rises to the level of a public concern.

■ Defendants further argue that there is no evidence Miranda's speech was a sub-

---

8. The Court found one question to involve a matter of public concern. The question asked whether assistant district attorneys felt pressured to work in political campaigns. The Court noted such pressure would be a clear violation of the

employees' constitutional rights, because there is a demonstrated interest in this country that government service should depend on meritorious performance rather than political service. *Connick,* 461 U.S. at 149, 103 S.Ct. at 1691.

stantial factor in the decision to prefer charges against Mascetta, and that regardless of Mascetta's speech, Correction was obligated under Department regulations to prefer charges where reports of excessive use of force had been made. While defendants may succeed in convincing the jury that these charges would have been filed in the absence of Mascetta's previous complaints, Mascetta's allegation that the charges of excessive force were perjured relies heavily on a credibility determination and therefore must be decided by a jury, not this court. A jury might consider it suspect that Miranda did not accept Bonanno's first report, but asked him to complete another one, and that he did not consider investigating any other officers involved in the Holcomb incident. A reasonable jury might find that, absent a desire to retaliate against Mascetta, the charges would not have been filed.

▪ Lastly, we cannot agree with defendants' broadly stated proposition that "Correction's interest in the functioning of its institution and disciplining of one of its officers who have been accused of using excess force on an inmate must outweigh the plaintiff's freedom of speech." Def. Br. p. 12. A prison administration's undeniable interest in maintaining order and discipline could never justify trumping up false charges against an officer to retaliate against him for complaining about lapses in security or improper activities of other officers. The motive for filing the charges against Mascetta is a disputed issue of fact. In addition, this is not a situation where the speech at issue in any way affected Correction's interest in disciplining its officers for use of excess force. Permitting Mascetta's speech in no way jeopardizes that interest, and no reasonable corrections officer would have thought that it did.

▪ Thus we deny defendants' motion for summary judgment on Mascetta's First Amendment claim (claim 1). While we are uncertain whether Mascetta's alleged speech complaining about Miranda's abuse of his supervisory authority by coercing employees to buy cars from his wife rises to the level of a public concern, we note that even if the incident itself could not support a claim for a First Amendment violation, the evidence is relevant to some of Miranda's other constitutional claims. It goes to Miranda's subjective intent in taking subsequent actions regarding Mascetta—to wit, whether these actions were taken in retaliation against Mascetta for prior actions or for purely legitimate, unrelated reasons. Thus we will allow the evidence to be presented at trial, reserving our decision as to whether it can serve as a basis for a First Amendment claim until after trial, should such a decision be necessary at that point.

### III. *Fourteenth Amendment Due Process Claim*

▪ Mascetta alleges that defendants have violated his substantive due process rights by providing false statements and reports in order to have him suspended, forcing him to defend himself against false charges, coercing him into giving up his firearms at a loss and subjecting him to "on-going" retaliation. Masc. Br. p. 22. In order to establish a violation of substantive due process, Mascetta must prove: 1) that defendants' deprived him of an interest that is considered fundamental because it is deeply rooted in our heritage and so crucial to an individual's freedom that neither "liberty or justice" would exist if it were sacrificed, *Bowers v. Hardwick*, 478 U.S. 186, 191–92, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140 (1986); and that defendants' action was arbitrary, conscience-shocking, or oppressive in a constitutional sense, not merely "incorrect or ill-advised." *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir.1994) (citations omitted).

Repeating their central theme in this motion, defendants ask us to dismiss this claim because Mascetta's allegations regarding defendants' motivations are based solely upon on "conjecture" insufficient to survive a motion for summary judgment. As discussed above, we reject this argument. Secondly, they urge that since they had "ample justification" for preferring the disciplinary charges, the charges do not "shock the conscience." We similarly reject this argument as well. Should a jury believe Mascetta's testimony, it could reasonably find that the charges would not have been preferred but

for a desire to retaliate against Mascetta. Were they so to find, the charges would not have been justified, and would indeed "shock the conscience."

Although the defendants did not go further, our inquiry cannot stop here. The Second Circuit has stated that "the first step in substantive due process analysis is to identify the constitutional right at stake." *Kaluczky v. City of White Plains*, 57 F.3d 202, 210 (2d Cir.1995). Moreover, it explained that "[a] plurality of the Supreme Court has recently stated that, where a § 1983 plaintiff alleges a cause of action predicated on a 'explicit textual source' of the Constitution, 'that amendment, not the more generalized notion of substantive due process,' must be the guide for analyzing that claim." *Id.*, (citing *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994) (Fourth Amendment claim)). However, the Second Circuit has also stated that "a prisoner has a substantive due process right not to be subjected to false misconduct charges for the exercise of a constitutional right such as petitioning the government for redress of his grievances. *Jones v. Coughlin*, 45 F.3d 677, 680 (2d Cir.1995) (citing *Franco v. Kelly*, 854 F.2d 584, 588 (2d Cir.1988) (right of access to courts is fundamental)); *but see Sandin v. Conner*, 515 U.S. 472, 115 S.Ct 2293, 132 L.Ed.2d 418 (1995) (Frivolous misbehavior report does not implicate any liberty interest of the prisoner and does not deprive him of any process due therefore unless atypical and significant hardship imposed). Though we have serious doubts as to whether Mascetta can establish a violation of a fundamental right sufficiently independent of an explicit textual source to support a separate claim for a violation his right to substantive due process, because the parties did not brief the issue and it is not clear from the complaint and moving papers whether he is even attempting to do so, we reserve judgment on whether to dismiss Mascetta's substantive due process claim until after trial.

Thus we deny defendants' summary judgment motion on Mascetta's third claim.

## IV. *Fourth Amendment Claim*

As the Supreme Court has explained:

The First Clause of the Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated...."

This text protects two types of expectations, one involving "searches," the other "seizures." A "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A "seizure" of property occurs when there is some meaningful interference with an individual's possessory interests in that property.

*United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984).

■■■ Mascetta has alleged that in violation of his Fourth Amendment and New York State Constitutional rights, defendants broke into his locker while he was on suspension and took some of his property, including his boots and his reports on the Holcomb incident. Masc. Depo. pp. 105–106, 211–212, 216, 219. Though neither party has briefed the issue of the existence and strength of a Correction's employee's right to privacy in his or her locker, we note that even if there is no such interest, or it is diminished, if Mascetta can establish that his property was taken from his locker, he has certainly established a "seizure." [9]

While Mascetta has no direct evidence linking defendants to the alleged break-in, or that it ever happened (Mascetta never filed an incident report), he testifies that it did, and concludes that defendants were responsible because they had access to his locker, located in a "secure area of the prison" and benefited from the loss of the reports. Defendants contend this evidence is too speculative to support his allegations. While we agree it is quite speculative, we cannot on a motion for summary judgment find that it is

---

9. Mascetta has requested that this court declare that Correction Officers have an expectation of privacy in their departmental lockers. Without the benefit of argument on this issue, we are not prepared to reach it at this time, but reserve our decision until after trial, should such a decision be necessary at that point.

wholly incredible. Such a determination is the province of a jury. A reasonable jury could find, based upon Mascetta's testimony and the circumstantial evidence he offers of opportunity and motive, that such reports did exist and that they were removed from his locker, along with other items, by or at the direction of the Defendants.

Thus we deny defendants' motion for summary judgment on Mascetta's fifth claim for relief.

### V. *Fourteenth Amendment Claims*

Since plaintiff has belatedly decided to drop his Fourteenth Amendment claims (claims 7 and 8), we do not need to reach them and simply order them dismissed with prejudice.

### VI. *Selective Prosecution under Fourteenth Amendment*

■ In order to establish a violation of equal protection based upon selective enforcement, a plaintiff must show that: (1) compared with others similarly situated, he was selectively treated; and (2) that such selective treatment was based upon impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. *LaTrieste Restaurant & Cabaret v. Port Chester*, 40 F.3d 587, 590 (2d Cir.1994).

■ Plaintiff alleges that the other Corrections Officers involved in the Holcomb incident were not similarly treated—they were neither investigated nor were disciplinary charges brought against them. We find this allegation sufficient to survive a motion for summary judgment. Should he be able to establish that the testimony against him was in fact perjured, and that the evidence against the other officers was comparable, he

will have shown that he was disparately treated.[10]

Additionally, we find that by alleging that the disciplinary charges filed against him were false and in bad faith retaliation for his speech, Mascetta certainly has met the second prong of the selective prosecution analysis. This is clearly an improper motive.

Thus we deny defendants' motion for summary judgment on claim nine.

### VII. *Pendent State Claims*

Because we have denied summary judgment to defendants on all of plaintiff's federal constitutional claims, and defendants have not separately argued for summary judgment on the merits of the remaining related state claims, these claims (numbers two, four, six and ten) shall be decided at the trial along with the federal claims.

### CONCLUSION

Because we find that Mascetta's testimony raises material issues of fact, we deny defendants' motion for summary judgment dismissing plaintiff's claims. However, to extent that Mascetta's First Amendment claim relies upon his alleged speech regarding Miranda's coercing correction employees to purchase cars from his wife, while we allow him to present this evidence at trial, we reserve decision on whether such speech, standing alone, implicates a matter of public concern capable of supporting a First Amendment claim. In addition, we reserve judgment on whether Mascetta has a right to privacy in his departmental locker that is protected by the Fourth Amendment from an unreasonable "search," as well as whether he has stated a Fourteenth Amendment substantive due process claim for a violation of a funda-

---

**10.** As additional proof of discriminatory effect, Mascetta apparently raised the "DeGraffenreit incident." Neither party has pointed us to the portion of the record that discusses "the DeGraffenreit incident," however. As best we can infer, the incident involved other Corrections officers who were videotaped using excessive force, but were not brought up on disciplinary charges. The County states that these officers were the subjects of criminal charges and a Grand Jury probe and that it would have been improper to bring disciplinary charges against them because they might have been forced to testify. Plaintiff counters they could have taken the Fifth. Since and it is not necessary to us to rely upon this incident in order for us to find that Mascetta has alleged he was treated disparately, we decline to comment on the similarity of the "DeGraffenreit incident" to Mascetta's allegations.

mental right that is independent of an explicit textual right.

SO ORDERED.